# Richmond.

## STATE HIGHWAY COMMISSION ET ALS *v.* WILLIAMS ET ALS.

January 17, 1924.

1. STREETS AND HIGHWAYS—*State Highway System—Whether Acts of State Highway Commissioner Constituted the Location or Establishment of a Certain Road as a Part of the State Highway System—Cast at Bar.*— In the instant case the question involved was whether the Highway Commissioner ever located and established a certain road as part of the "State highway system." The State Highway Commissioner temporarily took full charge and controlled the road in question as a part of the State highway system for the purpose of maintaining it at the State's expense, but, as he testified, with no purpose of adopting or establishing it as a part of the State highway system. He caused the road to be improved, placed a maintenance superintendant in charge, filed with the clerk of the county and of the board of supervisors a map and blue print designating the road as part of the State highway system "subject to change," placed a sign post on the road designating it as a part of the State highway system, and posted placards along the road stating that traffic over the road was subject to rules and regulations of the State Highway Commission. While admitting these facts, the State Highway Commissioner emphatically denied that he ever located or established the State highway along this road. From the evidence it seemed manifest that the general public did not at the time regard the acts of the Highway Commissioner as the location and establishment of the road as a part of the State highway system.

   *Held:* That the State Highway Commissioner did not establish the State highway system along the road in question, and even if it were doubtful, the interpretation of the State Highway Commissioner would be entitled to great weight.

2. STREETS AND HIGHWAYS—*State Highway System—Selection of Road as Part of System—Map Required by the Act of September 15, 1919.*—By Acts of 1919, chapter 31, it is the duty of the State Highway Commissioner, upon the establishment and location of a State road, to file a report of the same with the clerk of the circuit court or corporation court of the county or city in which the road is located, showing the location of the road, and immediately upon receipt of such notice,

it is provided that the clerk shall notify the local road authorities. A map entitled "road map of Montgomery county, showing county system" was filed, not with the clerk of the circuit court, but with the clerk of the board of supervisors. The map stated on its face that the approval of the Highway Commissioner applied "only to county system," and further, "State system subject to change." The clerk did not notify the local road authorities. It appeared from the testimony that the purpose of this map was to comply with the State aid law.

*Held:* That the filing of the map was not a location and establishment of a road shown on it as a part of the State highway system, as it did not conform to Acts of 1919, chapter 31.

Appeal from a decree of the Circuit Court of Montgomery county. Decree for complainants. Defendants appeal.

*Reversed.*

The opinion states the case.

*Willis, Adams & Hunter, Proffit & Weeks, B. G. Howard,* and *J. F. Hall,* for the appellants.

*Harless & Colhoun, Jackson & Henson, Jordan, Roop & Sowder, M. H. Tompkins, R. F. Tompkins,* and *J. E. Burwell,* for the appellees.

Burks, J., delivered the opinion of the court.

This was a suit in chancery brought by local road authorities of Montgomery county and a number of citizens and taxpayers of Montgomery and Floyd counties against the State Highway Commission and the members thereof, to enjoin them from expending certain State road funds under their control except in the manner prayed for in the bill. The injunction was granted as prayed for, and the defendants have appealed.

A number of interesting questions have been argued before us, such as the right of the complainants to maintain their suit, the liability of the defendants to be sued, the jurisdiction of the court, the absence of necessary parties, the venue of the suit, and the like, but it is unnecessary to pass upon them for if all of them were decided in favor of the complainants (appellees) they must still fail for want of sufficient proof to sustain the allegations of their bill.

[1] This is a controversy over a road as a unit of the "State highway system," the termini of which are Christiansburg, in Montgomery county, and Floyd courthouse, on route No. 23. The crux of the controversy is, did the Highway Commissioner ever locate and establish the road contended for by the complainants, known as the "Pilot" route, as a part of route 23.

We are of opinion that this question must be answered in the negative. There are two roads between Christiansburg and Floyd courthouse of practically the same length, not exactly parallel, but bowed out in the middle. One of these is spoken of as the "Pilot" road, and the other as the "Riner" road. Some years ago the Christiansburg magisterial district issued bonds for the improvement of its roads, and amongst others improved were the two above mentioned. The Riner road had been macadamized for about five miles, and something over three miles of the Pilot road had been macadamized, and work on it was stopped in June, 1918, and a respite was given the contractor on account of the scarcity of labor and the high costs of material as the result of the "World War," which was then in progress. At the time of the suspension there was still approximately $30,000.00 of the bond money unexpended. It is claimed by the appellees in their bill that the Highway Commissioner located and es-

tablished that part of route 23 south of Christiansburg·
along the Pilot road, and that having so established it
he could not thereafter change its location.   The facts
relied on as evidence of the establishment of the Pilot
route are epitomized in the petition for appeal substan-
tially as follows:

1. The State Highway Commissioner, in the year
1918, gave notice to Howard C. Gray, supervisor of·
Christiansburg. magisterial district, in Montgomery
county, that the State would assume full charge and
control over the said three miles of road, as a part of··
route 23 of the State highway system, and from that
time on the county would be relieved of all further·
costs of maintenance thereof.

2. The State Highway Commissioner, in the month
of June, or July, 1919, caused the said three miles of¨
improved road to be given a surface treatment of as--
phalt and gravel, at the cost of the State and with..
State funds.

3. On July 15, 1920, the commissioner placed W. L..
Crumpacker, as maintenance superintendent, in charge·
of said three miles, to maintain at the expense of the·
State, and that he has and is still maintaining it at the·
expense of the State.

4. The Commissioner, under date of September 15,.
1919, caused to be filed with A. P. Johnson, clerk of the·
county, and of the board of supervisors, a map and
blue print of the State and county system of roads
through Montgomery county, and this map, bearing·
the·signature of the Commissioner, as of September 8,
1919, clearly and plainly designates the road leading:
· from the Giles county line to Floyd county line, with.
an extension thereof on to Floyd courthouse, as running:
by way of Blacksburg, Christiansburg, Pilot, Camp,
Creek, as part of route No. 23, of the State highway·

system, while the Riner road is designated on said map as a part of the county road system of said county.

5. Prior to July 15, 1920, the Commissioner caused to be erected and placed at the end of the said three miles a sign post, designating the same as part of route No. 23; and that said Commissioner caused to be posted on said three miles printed placards, giving notice that traffic over said road was subject to the rules and regulations of the State Highway Commission, as provided in section 4, chapter 31 of Acts 1919. (Extra session.)

The "State highway system" was established by an act approved January 31, 1918 (Acts 1918, chapter 10, page 9). The act declared that the system should consist "of the roads and projects running from and to" certain designated points, and that the State Highway Commissioner should "locate and establish, by surveys or otherwise, as soon as possible the exact routes to be followed by the roads comprising 'the State highway system,' as set out above, and shall prepare and keep on file in his office for public inspection a complete map showing the routes so located and established by him. The said roads from and to the points designated above shall be designated and known as 'the State highway system'." It designated the funds out of which the roads composing the system should be established, constructed and maintained, and declared that "in undertaking the construction of roads on the routes constituting the State highway system preference so far as practicable shall be given to such parts of such routes as will form connecting links between permanent roads already constructed by State aid and from the proceeds of bond issues or other county funds contributed by counties, or cities or towns, to the end that equitable consideration may so far as possible be given those counties, cities and towns that may al-

ready have constructed parts of roads constituting the said system and also to the end that through routes across the State may be provided as speedily as may be practicable."

The act required the Highway Commissioner to locate and establish, by surveys or otherwise, as soon as possible, the exact routes to be followed by the roads comprising the system, and to prepare and keep on file in his office, for public inspection, a complete map of the routes so located and established by him. No appeal was provided from his decision, and no method was prescribed for evidencing his locations or establishments. He was to locate and establish the exact routes "by surveys or otherwise." But at the special session of the legislature, in 1919, an act was passed which went into effect September 5, 1919, by which it is declared that "It shall be the duty of the said Commissioner, upon the establishment and location of such route, whether heretofore or hereafter made, to file a report of the same with the clerk of the circuit court or corporation court of the county or city in which such road is located, showing the location of said road, and the appeal hereinbefore provided for shall be taken within thirty days from the filing of such report with such clerk. Immediately upon receipt of such notice the clerk shall notify the local road authorities of such city, county or district. Such appeal shall be heard forthwith and decided by the Commission, and in case of such appeal the Commission may hear such evidence as shall be properly brought before it and may view the routes and shall determine which route will, in its judgment, best serve the interests of the State, and its decision shall be final; provided, that notice of the time and place when the said Commission will hear such appeal shall be given by said Commission at least ten

days prior to such hearing, which notice shall be sent by registered mail to the clerk of the circuit court of the county or corporation court of the city from which said appeal was taken, and by any additional notice said Commission shall consider proper; and provided that, where the route has already been located and established by the Commissioner, under the authority conferred upon him by an act approved January thirty-first, nineteen hundred and eighteen, entitled 'an act to establish the State highway system,' no change shall be made in such route by the Commission. * *

"* * The Commission shall have power to make rules and regulations, not in conflict with the laws of this State, covering traffic on and use of the State highway system, and the rules and regulations so prescribed shall have the force and effect of law, and any person, firm or corporation violating any such rule or regulation shall be guilty of a misdemeanor, and, upon conviction thereof, be fined not less than five dollars ($5.00) not more than one hundred dollars ($100.00) for each offense." (Acts Ex. Sess. 1919, ch. 31, sec. 4, pp. 54-55.)

It will be observed that the latter act imposes upon the Highway Commissioner the duty of filing a report "upon the establishment and location of such route," and for immediate notice thereof to be given to the local road authorities; thereby affording official evidence of location, and that an appeal is allowed from his decision and the time prescribed within which it must be taken. These provisions were complied with when the Commissioner made the location on February 14, 1922, hereinafter referred to, but not prior thereto.

In 1918, when the State highway system was inaugurated, there were already a number of hard-surfaced roads in the State built by the counties or sub-

divisions thereof out of their own funds, some of which were along the routes to be adopted as parts of the State system, and others in that general direction. The State also set apart the money arising from licenses on automobiles as a special fund "for the maintenance or construction of roads and bridges included in the State highway system," and for maintenance alone after December 31, 1922. Acts Extra Session 1919, chapter 35, page 62. In the inauguration of the system all the roads constituting the State highway system had to be located and established, and this could not be done at once. It required time and necessitated delay. In the meantime there were hard-surfaced roads built by the counties which ran in the general direction of the State highway system, sometimes two or more of them, which were of great benefit to the public, but the Highway Commissioner was not ready or prepared to decide which, if either of them, he would select, or just where he would locate and establish the State highway. He had funds at his disposal for the maintenance of "roads and bridges included in the State highway system," and in order to move the traffic over these roads and to protect the investment of the public therein, the Highway Commissioner adopted the policy of including these roads temporarily in the State system for the purpose of maintaining them at the State's expense, but with no purpose of adopting or establishing them as parts of the State highway system. This he seems to have conceived to be the spirit of the act of 1918. A number of these roads are still maintained by the State in pursuance of the same policy, and in an affidavit of the late Highway Commissioner in opposition to the application to the trial court for the injunction, he states that "if these tentative locations of State roads, and the expenditure of said money in partial

maintenance thereof constituted a permanent location, it would greatly hamper the State Highway Department in its work and prevent it from rendering to the public the great public service which they are now rendering in many cases, pending location and construction of permanent roads in the State highway system; and that if the acts alleged in this case as constituting location should be held to be such, then a considerable portion of said State system has been located without so intending, and in many cases at points not seriously advocated as parts of the permanent highway system, and that such construction would work great detriment to the said State system." His deposition in the cause is to the same effect.

Whether the Highway Commissioner had the right to so expend the money of the State is not open to inquiry in this cause, except so far as such expenditure was evidence of the location and establishment of the Pilot road as a part of the State highway system. The appellants do not deny that the acts alleged in the bill were done, but say that they were mere acts of maintenance or incident thereto, except the filing of the map which will be hereinafter more particularly discussed. The Highway Commissioner is most emphatic in his denial that he ever located or established the State highway along the Pilot road, or ever intended to do so. He admits the acts of maintenance and repair and the other acts that are merely incidental thereto, or to the temporary use of the roads as parts of the State system, but states that they were only such as were done in many other portions of the State merely for the purpose of giving the traffic the temporary use of such roads while the State highway was being located and constructed, and to save the locality the benefit of its investment, but with no purpose of adopting or

8

establishing the road as a part of the State highway system. His subordinates testify to the same effect.

The surface treatment of the Pilot road was mere maintenance, and the employment of a superintendent to look after repairs, and the placing of sign posts and placards, were mere incidents of the temporary use of the road as a part of the public highway. The statement to the supervisor as to taking the road over the next year had reference to maintenance only, and was in fact carried out. There is a mass of evidence in the record tending to show that, from the outset until February 14, 1922, there were two contending factions, one seeking the selection of the Pilot route and the other the Riner route. The Highway Commissioner was beseiged by letters, by telegrams, by petitions, by briefs, by public meetings and otherwise; all seeking to have one of the roads or the other adopted and established. When asked to name some of the leaders of the partisans asking "to have you locate the State road in accordance with their desires." He replied, "Mr. —— made my life miserable for me, and Mr. —— a close second. Of course there were a number of others, but they were the most active." A number of these communications are contained in the printed record. In addition to these, there are filed in the record two stipulations of counsel, in one of which it is stated that after October 13, 1919, numerous petitions signed by several hundred citizens of Montgomery and Floyd counties were filed with G. P. Coleman, State Highway Commissioner, *urging him to select* the Riner route for State highway No. 23 between Christiansburg and Floyd, and stating that upwards of $38,000.00 in private subscriptions were offered to said Commissioner, after the date above mentioned, as *an inducement for the selection* of the Riner route. In the other, the identical state-

ment is made as to the Pilot route, except that the amount of the private subscriptions is put at about $23,000.00. It seems manifest that the general public did not at this time regard the acts of the Highway Commissioner as the location and establishment of the Pilot route as a part of the State highway system. Outside of the acts mentioned and the map now to be discussed, there is no evidence whatever that the Highway Commissioner ever located or established the State highway south of Christiansburg. There is only one road north of Christiansburg along the route of the State highway system, and there was never any doubt or controversy about the fact that the State highway system would follow this road, as it subsequently did, and several miles were constructed out of State funds. It is argued that no greater evidence of the establishment of this road as a part of the State system was afforded than of the road south of Christiansburg, but, aside from the construction of part of the former, we are not here concerned with the location and establishment of the road north of Christiansburg. It may never have been legally established, and even if the acts relied on were not sufficient to show that it was legally located, or established, that furnishes no reason for using similar acts to illegally establish the road south of Christiansburg. The only question that is material on this point is, did the Highway Commissioner, by the acts aforesaid, establish the State highway system south of Christiansburg along the Pilot route? We are of opinion that he did not. Even if it were doubtful, the interpretation of the Highway Commissioner should be entitled to great weight. *Richmond* v. *Drewry-Hughes Co.*, 122 Va. 178, 90 S. E. 635, 94 S. E. 989.

[2] Great reliance is placed upon a map filed before the

board of supervisors of Montgomery county on September 15, 1919, as a location and establishment of the Pilot route. At that time the act of September 5, 1919, was in effect. That act provided that it should be the duty of the Commissioner, upon the establishment and location of a State road, whether heretofore or hereafter made, to file the same with the clerk of the circuit or corporation court of the county or city in which the road is located, showing the location of the road, and that the appeal therein provided for should be taken within thirty days from the filing of such report. It further provided that immediately upon receipt of such notice the clerk should notify the local road authorities of such city, county or district.

The map referred to was in no sense a compliance with this statute. The map is entitled "road map of Montgomery county, showing county system." It was not filed with the clerk of the circuit court but with the board of supervisors. The clerk did not notify the local road authorities, and it expressly states on its face that the approval of the Highway Commissioner "applies only to county system," and further, "State system subject to change." This memorandum on the plat was signed by the Highway Commissioner, September 8, 1919. The map contains two yellow or orange lines to represent the State system when established, one running practically east and west and the other north and south, the latter embracing the Pilot route. Neither had at that time been actually located or established. It also contains numerous red lines to represent county roads. McConnell, resident engineer, testifying for the appellants, states that he put the red lines on the map "simply to locate the county system of roads," and that from his point of view it had nothing "to do with the location of a State high-

way." He further states: "At the time I had this map up before the board I explained it to them that the locations of the roads shown on this map were tentative; that the county system that they laid out that day would be subject to change if the board of supervisors saw fit to make a change, with the approval of the Highway Commissioner, and that the location of the State road as shown there was not a definite location. This was before the map was approved by the Highway Commissioner. Each member of the board of supervisors indicated the roads in his district that he wished included in the county system, so as to obtain the State aid provided by Acts 1918, page 776, and as he indicated them McConnell drew the red lines over them. Coleman, the Highway Commissioner, testified that the purpose of filing the map with the board of supervisors was as "the acceptance by the department of the county highways designated by the board of supervisors of Montgomery county, or so many of them as we approved," and that he did not intend it as a location of route 23 south of Christiansburg.

This map was returned to the board of supervisors of Montgomery county by C. B. Scott, assistant Highway Commissioner, on September 15, 1919, and with it he enclosed a letter saying: "Enclosed please find approved copy of map showing State and county system." Some importance seems to be attached to the fact that this letter contained no mention of the notations on the map. This was unnecessary. The map showed on its face that it was only a "road map of Montgomery county, showing county system," and that only the "county system" was approved by the Highway Commissioner, and "State system subject to change." It appears also from the testimony that the purpose of this map was to comply with the State aid law, and to

enable the county to obtain aid from the State in the construction and maintenance of its roads, and further that the Highway Commissioner would have approved it if it had put down the Pilot route instead of the Riner route as a part of the county system. It further appears that the designation "State and county road" is applied to "one in which the State joins with the county in its construction and in its maintenance, or in its maintenance or in its construction." No special importance, therefore, is to be attached to the language of the letter referred to.

The stipulations of counsel hereinbefore referred to show that the general public did not regard the Pilot route as established as a part of the State highway system. The testimony of the Highway Commissioner and his subordinates is that it was not established prior to February 14, 1922, and the Highway Commissioner on appeal "determined that the State Highway Commissioner did not locate and establish said route under chapter 10 of the Acts of 1918."

We are of opinion that the filing of the map as aforesaid was not a location and establishment of the Pilot route as a part of route 23 of the State highway system. It does not conform to the statute. Acts Extra Session 1919, chapter 31.

On February 14, 1922, the Highway Commissioner designated the Riner route as a part of the State highway system by the following communication addressed to the clerk of the circuit court of Montgomery county:

"Complying with section 4, chapter 31, Acts of 1919, I have to advise that we have designated the Floyd-Riner route as the route to be followed by State high-

way No. 23 between Floyd Court House and Christiansburg.

"I am enclosing herewith sketch map for your files.

"Yours very truly,

"G. P. COLEMAN,

"Commissioner."

The clerk gave to the local road authorities the notice required by statute, and an appeal was taken, as provided by the statute, to the State Highway Commission, which affirmed the decision of the Highway Commissioner. Objection was made to the jurisdiction of the Commission, on the ground that the Highway Commissioner had by the various acts hereinbefore recited selected the Pilot route, and that there had been no appeal from his decision, and hence his decision was final; but the Commission overruled the objection and, as stated, affirmed the designation of the Highway Commissioner. In this there was no error.

For the reasons stated, the decree of the circuit court of Montgomery county must be reversed, and the bill of the appellees dismissed, with cost to the appellants.

*Reversed.*